IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION


JOHN EDWARD ESTEP                    )
     Plaintiff                          )
                                     )
v.                                   )          No. 2:11-0017
                                     )
MICHAEL J. ASTRUE,                   )
     Commissioner of Social Security    )


To: The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"), as provided by the Social Security Act ("Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff is not disabled under the Act is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 12) should be DENIED.


## I. INTRODUCTION

On December 22, 2005, the plaintiff protectively filed applications for SSI and DIB, alleging a disability onset date of July 2, 1998, due to open heart surgery, rectal bleeding, tasting blood when

burping, dizziness, shortness of breath, depression, and chest pain. (Tr. 31-34, 76-81, 82-87, 93-102.) His application was denied initially and upon reconsideration. (Tr. 31-34, 37-40, 46-49.) The plaintiff amended his alleged onset date to December 22, 2004 (tr. 18, 140), and a hearing was held before Administrative Law Judge ("ALJ") James A. Sparks on March 10, 2009. (Tr. 15-30.) On April 21, 2009, ALJ William P. Newkirk, signing for ALJ Sparks, issued an unfavorable decision denying benefits. (Tr. 8-14.) On January 10, 2011, the Appeals Council denied the plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

## II. BACKGROUND

The plaintiff was born on May 28, 1964 (tr. 17, 88), and he was forty years old as of December 22, 2004, his amended alleged onset date. He is married, has a tenth grade education, and has previously worked as a maintenance laborer for a resort community. (Tr. 18, 95.) He has not worked since 2004. (Tr. 18.)

### A. Chronological Background: Procedural Developments and Medical Records

In 1998, the plaintiff underwent open-heart surgery. (Tr. 148.) He had been diagnosed with coronary artery disease ("CAD"), and the surgery released a myocardial bridge of the left anterior descending artery that had been 75% obstructed. *Id.* The plaintiff developed chest pain following surgery, and, on August 14, 2001, presented to Dr. Vianney E. Villaruz at the Crossville Medical Group. (Tr. 148-50.) Following an examination, Dr. Villaruz assessed the plaintiff with "[c]hest pain with features both atypical and typical for angina;" "angina, new onset;" "coronary artery disease by history secondary to myocardial bridge;" and "myocardial bridge over left anterior descending

2

artery." (Tr. 150.) The plaintiff's EKG showed "sinus bradycardia, isolated premature ventricular contractions, [and] non-specific intraventricular conduction defect." *Id*. Dr. Villaruz recommended that the plaintiff continue taking aspirin and nitroglycerin to relieve his chest pain and also recommended that the plaintiff undergo an exercise stress test. *Id.*

On September 4, 2001, the plaintiff underwent an exercise stress test. (Tr. 151.) The test revealed "normal myocardial perfusion with no reversible ischemia," and a stress ECG "was negative for ischemia by EKG criteria." *Id.* Dr. Villaruz noted that the plaintiff "had no chest pains with exercise." *Id.* At a followup examination on September 11, 2001, the plaintiff complained of pain in his left chest area that lasted between twenty minutes and two hours, was exacerbated by lying down, and occurred every day or two. (Tr. 152.) The plaintiff related that he experienced shortness of breath and diaphoresis along with chest pain but that he did not experience nausea or vomiting. *Id*. He described the pain as sharp and radiating down his left arm. *Id*. Dr. Villaruz noted that the chest pain was relieved by rest and nitroglycerin, and he referred the plaintiff to Dr. Steven Pribanich, also at the Crossville Medical Group, for primary care and to evaluate the plaintiff for noncardiac chest pain. (Tr. 152-153.) On December 13, 2002, the plaintiff presented to Dr. Pribanich, and he diagnosed the plaintiff with rectal bleeding with a history of colon polyps and possible CAD with unstable angina that needed to be "restudied." (Tr. 154-55.)

On January 7, 2003, the plaintiff returned to Dr. Villaruz for a cardiovascular followup. (Tr. 156.) Dr. Villaruz prescribed Lopressor[1] and recommended cardiac catheterization due to the plaintiff's "recurrent chest pain typical for angina with minimal activity and with accelerated

---

[1] Lopressor is an anti-anginal and anti-hypertensive. Saunders Pharmaceutical Word Book 414 (2009) ("Saunders").

3

pattern." (Tr. 157.) On the recommendation of Dr. Villaruz, on January 24, 2003, the plaintiff underwent a left heart catheterization, selective coronary angiography, and left ventriculogram. (Tr. 262-64.) The clinical impression following the cardiac catheterization indicated normal coronary arteries, normal left ventricle systolic function, and normal left ventricle pressure. (Tr. 263-64.)

On January 17, 2005, the plaintiff presented to Dr. Pribanich with complaints of chest pain, insomnia, and heartburn. (Tr. 160.) The plaintiff relayed that his chest pain occurred with activity and at rest and was not helped by nitroglycerin. *Id.* He also relayed that he smoked two packs of cigarettes per day and had stopped taking his medications due to insufficient funds. *Id.* Dr. Pribanich diagnosed the plaintiff with CAD, gastroesophageal reflux disease ("GERD"), and insomnia. (Tr. 161.) Noting that the plaintiff's chest pain occurred when he was not taking his prescribed medications, Dr. Pribanich advised him to continue his current medications and quit smoking. *Id.* The plaintiff again presented to Dr. Pribanich on July 18, 2005, with complaints of chest pain, insomnia, hemorrhoids, and dizziness. (Tr. 162.) The plaintiff reported having "palpitations" since his last visit, and Dr. Pribanich assessed him with chest pain, rectal bleeding, dizziness due to new anemia, hemorrhoids, and insomnia. (Tr. 162-63.) Dr. Pribanich concluded that the plaintiff's chest pain was noncardiac in nature and was instead related to his GERD. *Id.*

On August 30, 2005, the plaintiff presented to Dr. Mark Fox at the Crossville Medical Group with complaints of upper gastrointestinal symptoms and hemorrhoids. (Tr. 164.) A physical examination revealed normal ambulation without assistance and normal cognitive functions, and showed no pulmonary or cardiovascular abnormalities. (Tr. 164-65.) Dr. Fox assessed the plaintiff with "unspecified anemia" as well as internal and external hemorrhoids. (Tr. 165.)

4

The plaintiff returned to Dr. Pribanich on January 24, 2006, with complaints of shortness of breath and chest pain. (Tr. 166.) The plaintiff reported that his chest pain started earlier that week when he tried to grab a V-6 engine that was falling over. *Id.* He said that as he went to "hold it upright," his chest "popped." *Id.* Dr. Pribanich diagnosed the plaintiff with anterior chest pain consistent with "rib-sternal separation" and anemia. (Tr. 167.) A chest x-ray revealed "[s]ternal wires present from [a] previous sternal splitting procedure." (Tr. 168.) The x-ray indicated that the sternal wires were intact and was otherwise unremarkable. *Id.*

On March 14, 2006, the plaintiff underwent a consultative psychological evaluation with DDS examiner, Mark Loftis, M.A. (Tr. 182-86.) Mr. Loftis concluded that the plaintiff appeared to be "suffering from depressive symptoms" and could benefit from medication and individual counseling. (Tr. 185.) He concluded that the plaintiff did "not appear to have any significant cognitive limitations;" "may have difficulties in becoming overwhelmed in very stressful situations or situations that [he] will have to deal with a lot of people;" "can cooperate well reasonably independently from a work setting;" and his "overall functional limitations [are] in the mild to moderate range." *Id.* Later psychiatric reviews by DDS examiners, Victor O'Bryan, Ph. D., and Dr. Brad Williams, indicated that the plaintiff's depression impairment was "not severe" and created only mild restrictions of daily living activities and mild difficulties maintaining social functioning and maintaining concentration, persistence or pace. (Tr. 192-205, 228-41.)

On March 22, 2006, DDS physician Dr. Jerry Lee Surber performed a consultative physical examination. (Tr. 187-91.) The plaintiff reported having pain accompanied by stiffness and fatigue, which the plaintiff attributed to arthritis. (Tr. 187.) He denied any chest pain but complained of

5

shortness of breath on exertion. *Id.* He also reported having hemorrhoids, GERD, hypertension, depression, and anxiety. *Id*

Dr. Surber found the plaintiff to be well-developed, well-nourished, in no acute distress, and ambulating without a limp or antalgic gait. (Tr. 189-190.) Physical examination revealed that the plaintiff's chest and lungs were "[n]ontender, with no gross chest wall asymmetry." (Tr. 189.) The plaintiff had some dorsolumbar tenderness, but had "full and unlimited ranges of motion" in his shoulders, elbows, hips, knees, ankles, wrists, hands, and fingers. *Id.* The plaintiff was able to perform a full squat and could stand on one leg and perform straight leg raises with no evident limitations. (Tr. 190.) Although the plaintiff complained of a "minimal" amount of pain in his neck, lower back, and thumb, Dr. Surber found no limitations on functional mobility in these areas or in his joints. (Tr. 190.) Dr. Surber diagnosed coronary vascular disease and shortness of breath consistent with COPD but noted that the plaintiff denied chest pain, continued to smoke up to three packs of cigarettes per day, and showed no evidence of cyanosis. (Tr. 190-91.) Dr. Surber further diagnosed the plaintiff with recurrent hemorrhoids, GERD, hypertension, depression, and anxiety. (Tr. 190-91.) Dr. Surber opined that the plaintiff could "frequently lift or carry at least 10 to 35 pounds during up to one-third to two-thirds of an eight-hour work day" and "stand, walk or sit for up to six to eight hours in an eight-hour work day." (Tr. 191.)

On April 3, 2006, Dr. William Downey, a nonexamining consultative DDS physician, completed a physical Residual Functional Capacity ("RFC") assessment. (Tr. 220-27.) Dr. Downey concluded that plaintiff had no exertional, postural, manipulative, visual, communicative, or environmental limitations. (Tr. 221-24.)

6

On July 21, 2006, Dr. John P. Fields, a nonexamining consultative DDS physician, completed an RFC assessment. (Tr. 242-49.) Dr. Fields opined that the plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk about six hours and sit about six hours in an eight-hour workday; and push and/or pull an unlimited amount. (Tr. 243.) Dr. Fields found that the plaintiff had no postural, manipulative, visual, or communicative limitations but found that he should avoid concentrated exposure to extreme heat and cold. (Tr. 244-46.) Regarding the plaintiff's complaints of chest pain and popping, Dr. Fields noted that the plaintiff's "sternotomy wires remain intact" and that his doctors found the pain to be noncardiac in nature. (Tr. 249.)

On March 15, 2007, the plaintiff presented to nurse practitioner Faye Smith of the Deer Lodge Medical Clinic in Deer Lodge, Tennessee, with complaints of chest pain and difficulty sleeping. (Tr. 311.) The physical examination was normal with the exception of prolonged expiration, and Ms. Smith diagnosed the plaintiff with CAD, hemorrhoids, restless leg syndrome ("RLS"), and GERD. *Id.* The plaintiff followed up with Ms. Smith on May 3, 2007, for chest pain, shortness of breath, and bleeding from hemorrhoids. (Tr. 306.) A physical examination was normal with the exception of hemorrhoids, and Ms. Smith diagnosed the plaintiff with rectal bleeding, hemorrhoids, CAD, and insomnia. On August 17, 2007, Ms. Smith wrote an unaddressed letter stating that, in her professional opinion, the plaintiff "will be disabled for the remainder of his life."[2] (Tr. 298.)

---

[2] The photocopy of Ms. Smith's August 17, 2007 letter that is included in the record (tr. 298) is significantly obscured by a superimposed photocopy.

From August 2007, until March 2008, the plaintiff presented to Ms. Smith on ten occasions for a variety of maladies. (Tr. 283-97.)  During that time period, Ms. Smith diagnosed the plaintiff with gastritis, GERD, acute sinusitis, acute bronchitis, RLS, chest pain, hemorrhoids, rectal bleeding, anemia, CAD, and migraine headaches. (Tr. 283, 286-89, 293-97.)

Ms. Smith referred the plaintiff to Dr. Robert J. Lloyd for an evaluation of his rectal bleeding. (Tr. 277). After an evaluation on March 12, 2008, Dr. Lloyd's impression was "hematochezia, history of colon polyps, and history of hemorrhoids," and he recommended a colonoscopy for further evaluation of hemorrhoids and rectal bleeding as well as to screen for colon cancer. *Id.*  Dr. Lloyd performed a colonoscopy with hemorrhoid banding on March 14, 2008, and he instructed the plaintiff to obtain a cardiac evaluation prior to undergoing a hemorrhoidectomy. (Tr. 275-76.)

On April 1, 2008, the plaintiff presented to Dr. Stephen Teague, a cardiologist with Parkway Cardiology Associates in Oak Ridge, Tennessee, for an evaluation of his chest pain. (Tr. 257.)  The plaintiff reported continued chest pain that was no different than before he had heart surgery. *Id*. Dr. Teague relayed that "[a]ctivity does not clearly cause his chest discomfort," rather it is caused by "coughing and moving a certain way." *Id*.  The plaintiff remained a smoker but had reduced from two packs per day to five cigarettes per day after beginning to take Chantix.[3] *Id*.  After examining the plaintiff's chest, Dr. Teague noted that his sternum was "very tender over his top sternal wires." *Id.* Although Dr. Teague noted that "[t]here appears to be a notch in the manubrium and one wonders if there is complete union of manubrium," he also noted that the plaintiff's manubrium "actually looks pretty stable with three wires holding and those wires are intact and not broke." (Tr. 257, 259.) Dr. Teague did not see "an active disease process." (Tr. 259.) He recommended a stress test to

_____

[3] Chantix is a "smoking cessation aid." Saunders at 148.

8

evaluate whether the plaintiff should be cleared for hemorrhoid surgery and a later consultation to evaluate "whether or not we move forward on his painful manubrium." *Id.*

On April 3, 2008, an exercise stress test and myocardial perfusion scan revealed normal results. (Tr. 251, 253, 255.) On April 8, 2008, Dr. Lloyd performed a hemorrhoidectomy on the plaintiff without complications. (Tr. 270-71.)

The plaintiff followed-up with Dr. Teague on April 17, 2008, complaining of chest pain, tenderness, and loud "snapping" of his sternum. (Tr. 250.) Dr. Teague recommended a consultation with a cardiac surgeon and noted that plaintiff was willing to undergo surgery again if necessary. *Id*. Dr. Teague noted that plaintiff continued to smoke but could not afford Chantix. *Id*.

On May 8, 2008, the plaintiff presented to Dr. Charles Gholson with complaints of chronic heartburn and abdominal pain. (Tr. 319.) Dr. Gholson diagnosed the plaintiff with chronic GERD and early satiety, and he recommended the plaintiff undergo an esophagogastroduodenoscopy ("EGD") and ultrasound. (Tr. 320.) On May 19, 2008, the plaintiff underwent an ultrasound of the liver, which revealed "no acute findings," and an EGD, which also showed no abnormalities. (Tr. 315, 317.) Following the EGD, Dr. Gholson diagnosed the plaintiff with erosive esophagitis and erosive antral gastritis. (Tr. 315.) Dr. Gholson found "[n]o evidence of active peptic ulcer" (tr. 315) and prescribed Zegerid.[4] (Tr. 316.) The plaintiff followed up with Dr. Gholson on June 12, 2008, and reported improvement with medication; however, he complained of unresolved bloating. (Tr. 314.)

--------

[4] Zegerid is an antacid and proton pump inhibitor used to treat gastroesophageal disorders such as GERD and erosive esophagitis. Saunders at 775.

9

The plaintiff returned to Dr. Lloyd on May 29, 2008, for a followup examination on his hemorrhoidectomy. (Tr. 266.) The plaintiff presented no complaints and reported no significant pain following the procedure. *Id*. He continued to occasionally bleed; however, the bleeding was "not excessive and nowhere near what he had experienced before his surgery." *Id*. Upon examination, Dr. Lloyd found no pain or bleeding, and his impression was internal and external hemorrhoids. *Id*.

Ms. Smith examined the plaintiff again on June 4, 2008, and he complained of a stiff neck and soreness. (Tr. 281.) She found decreased cervical range of motion and diagnosed the plaintiff with cervical tendinitis. *Id*. On September 2, 2008, Ms. Smith completed a Medical Source Statement. (Tr. 321-24.) Ms. Smith opined that the plaintiff could occasionally and frequently lift and/or carry less than ten pounds; stand and/or walk less than two hours in an eight-hour workday; and sit less than six hours in an eight-hour workday. (Tr. 321-22.) Ms. Smith further opined that the plaintiff was limited pushing and pulling with his upper extremities, that he could never climb ramps, stairs, ladders, ropes, or scaffolding, and that he could occasionally balance, kneel, crouch, crawl, or stoop. (Tr. 322.) Ms. Smith attributed these limitations to cervical tendinitis, poor range of motion, chest pain with overexertion, and cardiac problems. *Id*. She assessed that the plaintiff had occasional manipulative limitations reaching but had unlimited capacity to frequently handle, finger, and feel. (Tr. 323.) Finally, Ms. Smith found that the plaintiff had no limitations seeing, hearing, or speaking and had unlimited capacity for noise and dust; however, she found that the plaintiff had a limited capacity for temperature extremes, vibrations, hazards, fumes, odors, chemicals, and gases due to cardiac strain and pain. (Tr. 323-24.)

10

### B. Hearing Testimony

At the hearing, the plaintiff was represented by counsel, and the plaintiff and Ms. Jane Hall, a vocational expert ("VE"), testified. (Tr. 17-29.) The plaintiff testified that he completed the tenth grade, has a driver's license, and is married. (Tr. 18.) He previously applied for DIB in 1998, was denied, and returned to work. (Tr. 17-18.)

The plaintiff testified that he had not worked since 2004 due to chest pain and "heart trouble." (Tr. 18-19.) He explained that he had open heart surgery in 1998, and his sternum had not grown back together, causing his chest to "pop" five or six times per day. (Tr. 18-19, 23-24.) The plaintiff relayed that his arms "go numb and weak" when his chest pops. (Tr. 19.) He testified that his doctors wired his sternum together following surgery but it has not helped him and has resulted in pain and rashes. (Tr. 25.) The plaintiff testified that on a pain scale of one to ten, his chest pain averages a six and becomes an eight or nine when the pain is at its worst. (Tr. 21.)

In addition to chest pain, the plaintiff also experiences pain in his hands and legs. (Tr. 19.) He relayed that his doctors believe the leg pain is related to either poor circulation or arthritis. (Tr. 19-20.) The plaintiff testified that his pain and arthritis are made worse by hot and cold weather. (Tr. 22.) He reported taking nitroglycerin pills for his chest pain. (Tr. 19.) He also takes Hydrocodone[5] for his pain but indicated that it did not relieve his pain. (Tr. 20.) The plaintiff testified generally that his medications do not give him side effects (tr. 20), but also said that nitroglycerin gives him headaches. (Tr. 19.) As a result of the headaches, the plaintiff does not take nitroglycerin as often as instructed. *Id.*

---

[5] Hydrocodone is a narcotic antitussive and analgesic. Saunders at 352.

11

The plaintiff estimated that he can walk approximately one block, stand 15-20 minutes, lift 10-15 pounds without pain, and sit in a chair for five minutes at a time. (Tr. 20.) He indicated that he could bend "pretty good." *Id.* The plaintiff denied receiving mental therapy and denied taking drugs for mental therapy. (Tr. 21.) He takes Trazodone[6] to help him sleep at night. *Id.* The plaintiff testified that he has trouble breathing, but he does not use an inhaler and smokes "about a pack-and-a-half" of cigarettes per day. *Id.* The plaintiff dresses and bathes himself without help. (Tr. 22.) His wife and daughter cook meals; however, he is able to make a sandwich. *Id.* The plaintiff sometimes goes grocery shopping with his wife, but he indicated that he "can't walk around the stores like she does." *Id.* The plaintiff explained that he watches television and uses the computer in the morning and "mostly sit[s] around the house." *Id.* The plaintiff testified that he lacks energy since his heart surgery and that he has not been prescribed medications to increase his energy level. (Tr. 23.) The plaintiff described his fatigue level as moderate to severe and testified that even when he gets a good night's rest he still feels tired. (Tr. 23-24.)

The VE testified that she had reviewed the plaintiff's vocational exhibit file prior to the hearing and listened to the plaintiff's testimony. (Tr. 27.) The VE also affirmed that her testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (Tr. 27-28.)

The ALJ asked the VE to consider a hypothetical forty-year old person with a tenth grade education and the plaintiff's work experience; who could walk, stand, and sit six hours total each in an eight-hour workday with normal breaks; who could occasionally lift or carry fifty pounds and frequently twenty-five pounds; who had the same pain as evaluated in the plaintiff's RFC; who was

---

[6] Trazodone is a triazolopyridine antidepressant and serotonin uptake inhibitor. Saunders at 716.

not receiving any mental treatment; and who took Trazodone for sleep. (Tr. 27.) The ALJ asked whether such a person would be able to return to any of the plaintiff's prior work, and the VE responded that such an individual could return to the plaintiff's prior work as a maintenance laborer for a resort community. *Id*. Next, the ALJ asked the VE, if the plaintiff's testimony were given full credibility, whether the plaintiff could perform his past jobs or any jobs existing in significant numbers. *Id.* The VE replied that he could not. *Id.*

The VE was next asked to consider the Medical Source Statement prepared by Ms. Smith. (Tr. 28.) The VE testified that an individual with the limitations found in Ms. Smith's Medical Source Statement could not perform any job. *Id*. Finally, the VE testified that a hypothetical individual with the plaintiff's age, education, and work experience and having moderate to severe fatigue or pain also could not work at all. *Id.*

### III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable ruling on April 21, 2009. (Tr. 8-14.) Based upon the record, the ALJ made the following findings:

1.     The claimant met the insured status requirements of the Social Security Act through June 30, 2005.

2.     The claimant has not engaged in substantial gainful activity since December 22, 2004, the alleged onset date, as amended (20 CFR 404.1571, *et seq.*, and 416.971, *et seq.*).

3.     The claimant has the following severe impairments: coronary artery disease, erosive esophagitis and erosive gastritis (20 CFR 404.1521, *et seq.*, and 416.921, *et seq.*).

\* \* \*

13

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

* * *

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and/or carry up to 25 pounds on a frequent basis and up to 50 pounds on an occasional basis; to stand and/or walk for a total of up to six hours per eight-hour workday; and to sit (with normal breaks) for a total of up to six hours per eight-hour work day.

***

6.  The claimant is capable of performing past relevant work as a maintenance laborer. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

* * *

7.  The claimant has not been under a disability, as defined in the Social Security Act, from December 22, 2004 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 10-14.)


# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28

14

L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory

diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that he suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See also Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S. Ct. 376, 157 L. Ed.2d 333 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the plaintiff is presumed disabled

16

without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)). *See also Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert.*

17

*denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L. Ed. 2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, he is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's claim at step four of the five-step process. At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since December 22, 2004, his alleged onset date. (Tr. 10.) At step two, the ALJ determined that the plaintiff's coronary artery disease, erosive esophagitis, and erosive gastritis were severe impairments. (Tr. 10-12.) At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 12.) At step four, the ALJ determined that the plaintiff was capable of

performing his past relevant work as a maintenance laborer. (Tr. 12-14.) Therefore, the ALJ determined that the plaintiff was not disabled. (Tr. 14.)

### C. The Plaintiff's Assertions of Error

The plaintiff argues that the Commissioner made two procedural errors by failing to consider medical reports submitted after the ALJ's decision and by allowing one ALJ to conduct the hearing and another ALJ to sign the final decision. Docket Entry No. 13, at 8-9. The plaintiff also contends that the ALJ did not properly evaluate the opinion of nurse practitioner Smith when he assigned it little weight. Docket Entry No. 13, at 7. Finally, the plaintiff argues that the ALJ did not properly evaluate his subjective complaints of pain as defined in 20 C.F.R. 404.1529(c). *Id.*

### 1. The plaintiff's assertions of procedural error are without merit.

The plaintiff finds fault with two procedural aspects of the Commissioner's decision. First, the plaintiff asserts that the Appeals Council failed to consider "updated" medical records that he submitted on August 30, 2010. Docket Entry No. 13, at 8. There is no indication that the Appeals Council received the additional medical records (tr. 1-3), and they are not contained in the record before this Court.  In his brief, the plaintiff describes the records as medical reports from: (1) Dr. John M. Whitley dated October 17, 2009, to March 23, 2010; (2) Roane Medical Center dated September 24, 2009; and (3) Methodist Medical Center dated November 19, 2009. *Id.* The plaintiff contends that these reports "contain objective evidence" of certain diagnoses that support his subjective complaints. Docket Entry No. 13, at 8-9. According to the plaintiff, "[t]hese reports were

Case 2:11-cv-00017   Document 18   Filed 01/18/13   Page 19 of 35 PageID #: 402

very crucial to the [p]laintiff's case and should have been marked and considered as evidence in this case." *Id*.

Because the supplemental reports are not contained in the record, the Court is left to speculate as to their contents. However, even if the plaintiff's assertions as to the contents of the records are accepted as true, he is not entitled to relief. The Regulations clearly provide that, "[i]f new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. §§ 404.970(b) and 416.1470(b). *See also Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986). Here, as the plaintiff acknowledges, each of the additional medical records relates to a period after the ALJ's decision on April 21, 2009. Thus, the Appeals Council was not required to consider the evidence. Moreover, even if the Appeals Council had reviewed the evidence before declining to review the case, this Court's review would be limited to the record before the ALJ at the time he rendered a decision. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) ("[T]his court has repeatedly held that evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review."). *See also Hammond v. Apfel*, 211 F.3d 1269, 2000 WL 420680, at *6 (6th Cir. Apr. 12, 2000); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, the plaintiff is not entitled to the relief he seeks.

Second, the plaintiff contends that it was procedural error for one ALJ to preside over the hearing while a different ALJ signed the decision. Docket Entry No. 13, at 9. Without providing any support for his contention, the plaintiff argues that "there should only be one Judge who should conduct the hearing, hear the proof and issue the decision." *Id.* The Commissioner argues that the

SSA's internal policies provide for the reassignment of ALJs and that the plaintiff has not shown that he was prejudiced by the reassignment.

The record on this issue is sparse. The transcript indicates that ALJ Sparks presided over the hearing. (Tr. 15.) The decision, however, was signed by ALJ Newkirk "for" ALJ Sparks.[7] (Tr. 14.) No explanation is given in the record as to why ALJ Newkirk signed the decision for ALJ Sparks.

Section I-2-8-40 of the SSA's Hearings, Appeals, and Litigation Law Manual ("HALLEX") provides procedures for situations in which the ALJ who conducted the hearing is unavailable to issue the decision. In a scenario where the ALJ who conducted the hearing is unavailable to issue the decision due to death, retirement, resignation, prolonged illness or other causes resulting in prolonged leave, the Hearing Office Chief ALJ ("HOCALJ") will reassign the case to another ALJ. *See* HALLEX § I-2-8-40. The incoming ALJ is given discretion to determine whether a new hearing is necessary, and section I-2-8-40 provides examples of circumstances when a new hearing "may be necessary." *Id.* Section I-2-8-40 also provides procedures for a second scenario in which "an ALJ has approved a final decision but is unavailable to sign the final decision." In that case, the HOCALJ has authority to sign the final decision on behalf of the temporarily unavailable ALJ with prior written authorization. *Id.*

There is no indication in the record whether the case was transferred to ALJ Newkirk by the HOCALJ. Likewise, there is no indication whether ALJ Newkirk is the HOCALJ signing on behalf of ALJ Sparks. Simply put, the record does not reveal whether the Commissioner complied with either scenario contemplated in HALLEX section I-2-8-40 when ALJ Newkirk signed the decision

_____

[7] The notice of unfavorable decision, which appears to have been authored by ALJ Sparks, begins, "I have made the enclosed decision in your case." (Tr. 5-7.)

for ALJ Sparks. Thus, the Court cannot determine whether the Commissioner complied with section I-2-8-40 or not.

However, even if the Commissioner did not comply with section I-2-8-40, HALLEX is not considered binding authority in the Sixth Circuit. *See Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 399 (6th Cir. 2008). *See also Alilovic v. Astrue*, 2012 WL 5611077, at *7 (N.D. Ohio Nov. 15, 2012) ("HALLEX is an 'internal guidance tool' for use by ALJs and other staff members, is not published in either the Federal Register or the Code of Federal Regulations, and does not have the force of law."); *Hedden v. Comm'r of Soc. Sec.*, 2011 WL 7440949, at *10 (W.D. Mich. Sept. 6, 2011) ("[T]he Court is aware of no controlling authority holding that the HALLEX regulations carry the force of law such that failure to act in conformity therewith is a sufficient basis for relief."); *Kendall v. Astrue*, 2010 WL 1994912, at *4 (E.D. Ky. May 19, 2010) ("HALLEX does not create a procedural due process issue as do the Commissioner's regulations in the Code of Federal Regulations."). Consequently, even if the Commissioner failed to follow HALLEX procedures, such a fact would not necessarily entitle the plaintiff to relief.

Other courts considering similar factual scenarios have required a showing of prejudice before affording relief. *See, e.g.,* Report and Recommendation entered in *Pehrson v. Soc. Sec. Admin. Comm'r*, 2011 WL 2650187, at *2-3 (D. Maine July 6, 2011) and adopted by the court (affirming Commissioner's decision "[i]n the absence of some suggestion of actual prejudice" when the ALJ who presided at the hearing wrote the decision and a second ALJ signed the decision "for" the presiding ALJ); *Kendall,* 2010 WL 1994912, at *4 (affirming the Commissioner's decision and finding there was "not a convincing showing of prejudice" when a second ALJ "signed for" the presiding ALJ; "the implication of such a format of signature is that the hearing decision had been

22

prepared by" the presiding ALJ and signed in his absence). *Cf. Cohan v. Comm'r of Soc. Sec.*, 2011

WL 3319608, at *4-6 (M.D. Fla. July 29, 2011) (finding prejudice when ALJ who did not preside

at the hearing signed the decision without "signing for" the presiding ALJ, and the decision was

"inconsistent" and "specifically relied on observations of [p]laintiff's demeanor at the hearing" in

making a credibility determination[8]). In this case, the plaintiff has made no allegation of prejudice

and none is apparent from the record. Consequently, he is not entitled to relief on this issue.


### 2. The ALJ properly weighed the medical opinion evidence of Ms. Smith.

The plaintiff next finds fault with the ALJ's decision to give nurse practitioner Smith's

opinion little weight. Docket Entry No. 13, at 6-7. The plaintiff implies that the ALJ disregarded

Ms. Smith's opinion because she was not an "acceptable medical source" under SSA Regulations,

therefore, ignoring regulatory guidance instructing that opinions from "other sources" may also be

considered. *Id.* (citing 20 C.F.R. § 404.1513). The Commissioner contends that the ALJ properly

evaluated Ms. Smith's opinion because "her opinion was offered without support and was

inconsistent with the other evidence of record." Docket Entry No. 14, at 14.

Generally, an ALJ is required to give "controlling weight" to the medical opinion of a

treating source, as compared to the medical opinion of a non-treating source, if the opinion of the

treating source is "well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R.

---

[8] In the instant case, the decision does not mention the plaintiff's demeanor at the hearing.
Rather, in determining the plaintiff's credibility with respect to his subjective complaints, the
decision focuses solely upon the plaintiff's testimony and the objective medical record. *See Hedden*,
2011 WL 7440949, at *10 (citing *Shave v. Apfel*, 238 F.3d 592, 597 (5th Cir. 2001)).

§ 416.927(c)(2).[9] *See also Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. Aug. 31, 2010); *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009). This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

Even if a treating source's medical opinion is not given controlling weight, it is "'still entitled to deference and *must be weighed using all of the factors provided in [20 C.F.R. 416.927]* . . . .'" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. 2006) (quoting current 20 C.F.R. § 404.1527(c)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (citing current 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2)). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* If an ALJ fails to adhere to this procedural requirement, the case

---

[9] Effective March 26, 2012, the numbering for the treating physician rules changed. Section 416.927(d)(2) became section 416.927(c)(2), and the identically worded and interpreted section 404.1527(d)(2) became section 404.1527(c)(2). *See Johnson-Hunt v. Comm'r of Soc. Sec.*, 2012 WL 4039752, at *6 n.6 (6th Cir. Sept. 14, 2012).

24

should be remanded for further clarification.[10] *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-45 (6th Cir. 2004).

However, under the Regulations, nurse practitioners are not classified as acceptable medical sources but as "other sources."[11] 20 C.F.R. § 404.1513(d). Social Security Ruling ("SSR") 06-03p has noted that:

> [w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file.

---

[10] The rationale for the "good reasons" requirement is to provide the claimant with a better understanding of the reasoning behind the decision in his case and to ensure that the ALJ properly applied the treating physician rule. *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

[11] The Regulations define other sources as:

(1) Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists);
(2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers);
(3) Public and private social welfare agency personnel; and
(4) Other non-medical sources (for example, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy).

20 C.F.R. § 404.1513(d).

Soc. Sec. Rul. 06-03p, 2006 WL 2329939, at *3 (quoted in *Heaberlin v. Astrue*, 2010 WL 1485540, at *4 (E.D. Ky. Apr. 12, 2010)).  SSR 06-03p clarified the treatment of "other sources" by explaining that:

> [a]lthough the factors in 20 CFR 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from "acceptable medical sources," these same factors can be applied to opinion evidence from "other sources." These factors represent basic principles that apply to the consideration of all opinions from medical sources who are not "acceptable medical sources" as well as from "other sources," such as teachers and school counselors, who have seen the individual in their professional capacity. These factors include:
>
> • How long the source has known and how frequently the source has seen the individual;
> • How consistent the opinion is with other evidence;
> • The degree to which the source presents relevant evidence to support an opinion;
> • How well the source explains the opinion;
> • Whether the source has a specialty or area of expertise related to the individual's impairment(s); and
> • Any other factors that tend to support or refute the opinion.

2006 WL 2329939, at *4-5.  *See also Roberts v. Astrue*, 2009 WL 1651523, at *7-8 (M.D. Tenn. June 11, 2009) (Wiseman, J.).  Finally, SSR 06–03p provides that:

> [s]ince there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

2006 WL 2329939, at *6 (quoted in *Boran ex rel. S.B. v. Astrue,* 2011 WL 6122953, at *13 (N.D. Ohio Nov. 22, 2011). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007); *Hatfield v. Astrue*, 2008 WL 2437673, at *3 (E.D. Tenn. June 13, 2008) ("The Sixth Circuit,

26

however, appears to interpret the phrase 'should explain' as indicative of strongly suggesting that the ALJ explain the weight, as opposed to leaving the decision whether to explain to the ALJ's discretion.") (quoted in *Boran*, 2011 WL 6122953, at *13; and *Brandon v. Astrue*, 2010 WL 1444639, at *9 (N.D. Ohio Jan. 27, 2010)).

In her September 2008 Medical Source Statement, Ms. Smith opined that the plaintiff suffered from cervical tendinitis, poor range of motion, chest pain with overexertion, and cardiac problems and that he could occasionally lift and/or carry less than ten pounds; frequently lift and/or carry less than ten pounds;[12] stand and/or walk less than two hours in an eight-hour workday; and sit less than six hours in an eight-hour workday. (Tr. 321-22.) Ms. Smith further opined that the plaintiff was limited in pushing and pulling with his upper extremities, that he could never climb ramps, stairs, ladders, ropes, or scaffolding, and that he could occasionally balance, kneel, crouch, crawl, or stoop. (Tr. 322.) She also believed that the plaintiff had manipulative limitations reaching and had a limited capacity for temperature extremes, vibrations, hazards, fumes, odors, chemicals, and gases. (Tr. 323-24.)

As a basis for his decision giving Ms. Smith's opinion little weight, the ALJ first noted that, as a nurse practitioner, Ms. Smith was not a "treating source" as defined in the Regulations. (Tr. 13.) The ALJ also noted that, "the opinions of Nurse Smith were offered without analysis or elaboration, other than reciting a list of symptoms, and the medical record did not support the consistent presence of the symptoms cited." *Id.*

---

[12] In her Medical Source Statement, Ms. Smith checked boxes indicating that the plaintiff could occasionally *and* frequently lift and/or carry less than ten pounds. (Tr. 321.)

After reviewing the record, the Court concludes that the ALJ properly assessed Ms. Smith's medical opinion. First, the ALJ was correct that Ms. Smith's opinion was not entitled to controlling weight because she was not a treating source. Second, as noted by the ALJ, Ms. Smith's Medical Source Statement does not contain analysis or elaboration in support of her opinion and merely recites the plaintiff's symptoms. The Regulations note that "supportability," or explanation and relevant evidence presented to support an opinion, is a factor to be considered when evaluating medical opinions. 20 C.F.R. §§ 404.1527(c)(3); 416.927(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give the opinion."). Here, Ms. Smith did not explain her opinion, and her accompanying treatment notes generally reflect unremarkable examinations and do not support the significant limitations that she places on the plaintiff.[13]

Finally, the Court also agrees with the ALJ's assessment that Ms. Smith's opinion was inconsistent with the medical record. The ALJ specifically noted that, while Ms. Smith opined that the plaintiff was limited due to a restricted range of motion, in March of 2006, Dr. Surber found the plaintiff to have "a full range of motion throughout the upper and lower extremities, with no abnormalities of the joints." (Tr. 13.) The ALJ also pointed out that while Ms. Smith found the plaintiff to be limited based upon his chest pain, other medical sources had found his chest pain to be "intermittent and not particularly severe." *Id.*

---

[13] The Court made every attempt to decipher the medical evidence of record; however, many of Ms. Smith's handwritten treatment notes, as well as handwritten portions of her Medical Source Statement, were illegible.

In addition to these specific examples, Ms. Smith's opinion was generally inconsistent with the other medical opinions in the record. The ALJ gave greater weight to the opinion of Dr. Surber (tr. 13-14), who examined the plaintiff and found him to have full and unlimited motion in his shoulders, elbows, hips, knees, ankles, hands, wrists, and fingers and no functional limitations in the areas in which the plaintiff complained of pain. (Tr. 187-91.) Dr. Surber opined that the plaintiff could "frequently lift or carry at least 10 to 35 pounds during up to one-third to two-thirds of an eight-hour work day" and "stand, walk or sit for up to six to eight hours in an eight-hour work day." (Tr. 191.) Additionally, nonexamining consultative DDS physicians, Drs. Downey and Fields, provided RFC assessments that differed dramatically from Ms. Smith's opinion. (Tr. 220-27, 242-49.) Dr. Downey opined that the plaintiff had no limitations whatsoever (tr. 221-24), and Dr. Fields concluded that the plaintiff had no postural, manipulative, visual, or communicative limitations and could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk about six hours and sit about six hours in an 8-hour workday; and push and/or pull an unlimited amount. (Tr. 243-46.) The ALJ found that these assessments "were reasonably consistent with the weight of the medical evidence" and gave them the greatest weight. (Tr. 14.)

Given the ALJ's stated reasons, the Court concludes that substantial evidence supports his decision to give Ms. Smith's opinion little weight.[14]

---

[14] In the summary portion of his brief, the plaintiff asserts that the ALJ also did not properly evaluate the "opinion evidence" of Dr. Teague, whom he refers to as his "treating specialist." Docket Entry No. 13, at 9. Dr. Teague examined the plaintiff on two occasions: first, on April 1, 2008, for an evaluation of his chest pain prior to a hemorrhoidectomy (tr. 257, 259), and then for a followup examination on April 17, 2008. (Tr. 250.) These two visits fall short of establishing "an ongoing treatment relationship" with Dr. Teague. *See, e.g., Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007). Moreover, the record does not contain a medical opinion from Dr. Teague regarding the plaintiff's functional limitations. The plaintiff cites Dr. Teague's April 1, 2008 treatment note, which reports that the plaintiff is "disabled ostensibly because of his cardiac condition and other

29

**3. The ALJ properly evaluated the plaintiff's subjective complaints of pain.**

The plaintiff contends that the ALJ erred in evaluating the credibility of his subjective complaints of pain. Docket Entry No. 13, at 7-8. The Commissioner counters that the ALJ correctly determined that the objective medical evidence did not support the plaintiff's allegations of disabling pain. Docket Entry No. 14, at 10-13.

The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision of credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the claimant's complaints as incredible, he must clearly state his reason for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp.2d 954, 958 (N.D. Ohio 2003) (citing *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. July 7, 1994)).

Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186, at *4. In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence. *Id.* at *5. Consistency between the plaintiff's subjective complaints and the record evidence "tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect." *Kalmbach v. Comm'r of Soc. Sec.,* 2011 WL

medical problems which are not disclosed to me at the current time." Docket Entry No. 13, at 4; (Tr. 257.) However, it is clear from this statement, which is contained under the heading, "History of Present Illnesses" (tr. 257), that Dr. Teague was merely relaying what the plaintiff told him and was not concluding that the plaintiff was disabled. The plaintiff is not entitled to relief on this issue.

Case 2:11-cv-00017   Document 18   Filed 01/18/13   Page 30 of 35 PageID #: 413

63602, at *11 (6th Cir. Jan. 7, 2011). The ALJ must explain his credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4.

Both the SSA and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. See 20 C.F.R. § 404.1529; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit in *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[15] The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Felisky*, 35 F.3d at 1039 (quoting *Duncan*, 801 F.2d at 853). The second prong has two parts: "(1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

In this case, the ALJ found that:

The claimant testified at the hearing that he continues to experience episodes of chest pain during which his upper extremities go weak. He stated that his hands and legs hurt and that extremes of temperature bother his chest. He estimated that he could lift no more than 15 pounds and sit comfortably for no more than five minutes at a time.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the

---

[15] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n.2.

alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The medical evidence indicated that the claimant's coronary functioning was close to normal, despite occasional episodes of chest pain. There were no subjective complaints of upper extremity weakness, and no objective support for that contention. There were no complaints of hand or leg pain, and no objective findings to support a limitation of the claimant's ability to sit.

(Tr. 13.)

The ALJ satisfied the first prong of the *Duncan* test when he concluded that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." *Id.* Given that the second prong of the *Duncan* test consists of two alternatives, the plaintiff must only meet one of the following two elements: the objective medical evidence "confirms the severity of the alleged pain arising from the condition" or the "objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." The SSA provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. § 404.1529(c). The ALJ cannot ignore a plaintiff's statements detailing the symptoms, persistence, or intensity of his pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. § 404.1529(c)(2). Besides reviewing medical records to address the credibility

of a plaintiff's symptoms of pain, an ALJ must review the entire case record in light of the seven factors set forth in 20 C.F.R. § 404.1529(c)(3).[16]

Here, the ALJ relied upon the plaintiff's medical records and testimony in making his credibility finding. (Tr. 13.) The ALJ noted that the plaintiff's coronary functioning "was close to normal" despite occasional chest pain and that the record showed no complaints of upper extremity weakness or objective support for such a claim. *Id.* Additionally, while the plaintiff testified to having hand and leg pain, he had not previously complained of such pain and there were "no objective findings to support a limitation of the claimant's ability to sit." *Id.* In examining the plaintiff's extensive medical history (tr. 10-12), the ALJ noted Dr. Surber's conclusion that the plaintiff had a full range of motion in his extremities, negative straight leg raise testing, and normal strength, reflexes, and gait. (Tr. 11, 188-90.) There were no signs of edema in his extremities, and his blood pressure was well-controlled. *Id.* While the plaintiff testified that his chest had not healed properly after his 1998 surgery (tr. 25), x-rays taken in 2008 revealed that his manubrium was stable and intact. (Tr. 259.)

---

[16] The seven factors under 20 C.F.R. § 404.1529(c)(3) include: (i) the plaintiff's daily activities; (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms; (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms; (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on his back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) other factors concerning the plaintiff's functional limitations and restrictions due to pain or other symptoms.

The Court finds that the ALJ properly weighed the evidence in the record and did not err in determining that the plaintiff's allegations of disability were not fully credible.[17] In reaching his decision, the ALJ relied upon the medical opinions of Drs. Surber, Downey, and Fields, each of whom opined that the plaintiff was not significantly disabled.[18] The ALJ also specifically considered the plaintiff's testimony regarding episodes of chest pain and upper extremity weakness, the fact that temperature extremes aggravate his chest pain, and his reports that he could not comfortably sit in a chair for more than five minutes nor lift more than fifteen pounds. (Tr. 12.) Additionally, the plaintiff testified regarding his functional limitations, daily activities, and medication and treatment he received. The ALJ's decision indicates that he complied with the *Duncan* test and 20 C.F.R. § 404.1529(c) in evaluating the plaintiff's subjective complaints. Accordingly, the plaintiff is not entitled to relief on this issue.

## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 12) be DENIED and the Commissioner's decision be AFFIRMED.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation, and must state with

---

[17] The plaintiff argues that the supplemental medical records he filed with the Appeals Council further support his subjective complaints. Docket Entry No. 13, at 8-9. However, as noted above, these records relate to a time period after the ALJ's decision and are not properly before the Court. Consequently, they have not been considered in determining whether the ALJ properly evaluated the plaintiff's subjective complaints.

[18] The ALJ also cited the opinions of DDS psychiatric evaluators Victor O'Bryan and Brad Williams, both of whom found the plaintiff's depression impairment to be non-severe. (Tr. 14.)

34

particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

JULIET GRIFFIN
United States Magistrate Judge

35